**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

PANKAJ T. DESAI, M.D.,

        Plaintiff,

vs.                                Case No.  5:12-cv-495-Oc-34PRL

WILLIAM O. FARMER, JR., as the Sheriff
of Sumter County, Florida, et al.,

        Defendants.
_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment and Memorandum of Law (Doc. No. 35; Motion), filed on March 3, 2014, and Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 40; Response), filed on March 25, 2014.  In the Motion, Defendants seek the entry of summary judgment as to all claims against them.  In support of such relief, Defendants submit the Affidavit of Michael S. Cassidy (Doc. No. 35-1; Cassidy Aff.) and exhibits, the Affidavit of Michael A. Bishop (Doc. No. 35-2; Bishop Aff.), and exhibits, an excerpt of the transcribed Videotaped Deposition of Pankaj T. Desai, M.D. (Doc. No. 35-3; Desai Dep.), and the Affidavit of Gary Brannen (Doc. No. 35-4; Brannen Aff.), which includes as exhibits the Sumter County Sheriff's Office Operations Directives regarding the use of force and training programs.  In opposing summary judgment, Plaintiff submits the Affidavit of Essardai Rajkumar (Doc. No. 40-1; Rajkumar Aff.), the Affidavit of Pankaj T. Desai (Doc. No. 40-2; Desai Aff.), and the Affidavit of Raj Desai (Doc. No. 40-3; Raj Desai Aff.).  The Motion is fully briefed and ripe for the Court's consideration.

## I.     Background Facts[1]

Defendants, Deputies Michael Cassidy (Cassidy) and Michael Bishop (Bishop), are

deputies with the Sumter County Sheriff's Office (SCSO).  Cassidy Aff. ¶ 2, Bishop Aff. ¶ 2.

On July 2, 2010, the two deputies traveled to the Integrated Family Medical Center (IFMC),

in The Villages Florida to serve an instanter subpoena for medical records pertaining to a

female patient and alleged assault victim.  Cassidy Aff. ¶¶ 3-4; Bishop Aff. ¶ 3; Desai Aff. ¶

2.  Kalpana Desai, M.D. owned and operated the IFMC.  Cassidy Aff. ¶ 3; Bishop Aff. ¶ 3;

Desai Aff. ¶ 3.  Raj Desai, the son of Kalpana Desai and Plaintiff, Pankaj T. Desai (Desai),[2]

had allegedly assaulted the patient while she was in an examining room at the IFMC.

Cassidy Aff. ¶ 3; Bishop Aff. ¶ 3; Desai Aff. ¶ 5.  Upon arrival at the IFMC, Cassidy and

Bishop saw Raj Desai walking through the parking lot and Cassidy placed him under arrest.

Cassidy Aff. ¶ 4; Bishop Aff. ¶ 4.  Other officers then took Raj Desai to the detention center,

and Deputies Cassidy and Bishop remained on scene to serve the subpoena and obtain the

medical records.  Cassidy Aff. ¶ 4; Bishop Aff. ¶ 4; Desai Aff. ¶ 8.

Cassidy and Bishop entered the IFMC building and Cassidy gave the subpoena to the

office manager, Myrna Kinzel (Kinzel).  Cassidy Aff. ¶ 5; Bishop Aff. ¶ 5.  Kinzel instructed

Bishop and Cassidy to wait in an examining room.  Cassidy Aff. ¶ 5; Bishop Aff. ¶ 5.

Essardai Rajkumar, the receptionist for the IFMC, which shares office space with another

medical   provider,   described   the   deputies's   entrance   as   aggressive,   and   their

---

[1]       As discussed below, because this case is before the Court on Defendants' Motion for
summary judgment, the facts recited herein and all reasonable inferences therefrom have been viewed
in a light most favorable to Desai.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

[2]       To avoid confusion, the Court will refer to the other members of the Desai family by their
first and last names.

communications with Kinzel as loud and disruptive to the patients of both medical offices. Rajkumar Aff. ¶¶ 2-7. Rajkumar also stated that Bishop and Cassidy threatened to arrest Kinzel if she did not provide the necessary records. Id. ¶ 8. Kinzel[3] called Kalpana Desai, who was not in the office that day. Desai Dep. at 54; Desai Aff. ¶ 7. Kalpana Desai, in turn, notified Desai of their son's arrest. Desai Aff. ¶ 7; Desai Dep. at 54.[4] Desai also spoke with Kinzel on the phone, and she informed Desai that the deputies were making a scene in the reception area. Desai Dep. at 54. Desai testified that he instructed Kinzel, who was crying, to tell the deputies to sit in a room. Id.

Desai arrived shortly after his son's arrest, roughly ten minutes after receiving the call from his wife. See id. Upon his arrival, the deputies were already waiting in the examination room and/or the hallway in front of the examination room. See id. at 54-55. According to Desai, Kinzel informed him that she had given Cassidy the medical records. See id. at 59.[5] Desai describes his own demeanor as calm, but that of Cassidy as threatening and verbally

---

[3]      Desai refers to Kinzel as Myrna Reyes in his deposition, which presumably is either her maiden or former married name. Desai Dep. at 54.

[4]      In Raj Desai's Affidavit, he states that he was in the IFMC building prior to his arrest and he directed Kinzel to call his attorney and his father. Raj Desai Aff. ¶¶ 3, 5.

[5]      The parties disagree as to whether the officers had received the medical records and their respective attitudes and demeanor. Bishop and Cassidy state in their Affidavits that they were waiting for Kinzel to return with the records when Desai entered the room. Cassidy Aff. ¶ 5; Bishop Aff. ¶ 5. Cassidy describes Desai as entering the room with the subpoena in his hand, acting abrasive and talking about the important people he knew. Cassidy Aff. ¶ 5. Bishop similarly describes Desai as having been "belligerent and mean," informing them that he was a doctor, an educated man, and he could not provide the medical records. Bishop Aff. ¶ 5. According to the deputies, Cassidy, the one who either primarily or exclusively spoke to Desai, spoke in a normal tone and explained the significance of the subpoena to him. Cassidy Aff. ¶ 5; Bishop ¶ 5; Desai Dep. at 56 (stating Bishop was just agreeing with everything Cassidy was doing); see also Bishop Aff. ¶ 8 ("During the entire encounter with Desai, Officer Cassidy's speech and demeanor were polite and professional. He never became agitated, but was determined to get the records."). Because the Court views the evidence in the light most favorable to Desai and the above conflicts with Desai's version of events, the Court construes the facts as Desai presents them for the purposes of determining whether summary judgment is appropriate.

-3-

abusive.  Desai Aff. ¶ 10; Desai Dep. at 55-57.  Desai states that Cassidy and Bishop were loudly requesting medical records that they already had, and that they were cussing, angry and "throwing power."  Desai Aff. ¶¶ 9-12; Desai Dep. at 56-57.  In his deposition Desai testified that Cassidy and Bishop threatened to arrest him for obstruction of justice if he did not cooperate.  Desai Dep. at 56-57.[6]  Desai states that he asked to view the subpoena and Cassidy gave it to him, and the parties agree that Desai then asked the deputies if they would step outside and they agreed.  Desai Aff. ¶ 15; Cassidy Aff. ¶ 6; Bishop Aff. ¶ 6.  After exiting the building, the two deputies and Desai were alone on the porch area of the IFMC.  See Desai Dep. at 57-58.

While outside, Cassidy asked Desai if he worked at the medical center and he responded negatively.  Cassidy Aff. ¶ 7; Bishop Aff. ¶ 7; Desai Aff. ¶ 16.  In his deposition, Desai explains that Cassidy kept saying that Desai did not work there and they did not want to talk to him, and Desai kept responding that Cassidy already had the records he needed.  See Desai Dep. at 58-59.  According to Desai, Cassidy was holding the medical records, but he did not want to accept that the entirety of the medical records was one piece of paper.  See id.  Upon realizing that Desai did not work at the IFMC, Cassidy snatched the subpoena from Desai and turned to re-enter the IFMC building.  Desai Aff. ¶ 17; Bishop Aff. ¶ 7; Cassidy Aff. ¶ 7.  The main dispute in this action concerns what happened as Cassidy walked through the door.

---

[6]     Cassidy and Bishop do not dispute that Cassidy threatened to arrest Desai, but contend that he did so after they spoke outside and all three men had returned into the building.  See Cassidy Aff. ¶ 7; Bishop Aff. ¶ 8.

The single door at the entrance to the IFMC opens outward, with the outside knob or handle on the left-hand side, and has a mechanism which closes the door automatically. See Desai Dep. at 60-62; Cassidy Aff. ¶ 17.  In his Affidavit, Desai states that he was following Cassidy closely, still attempting to speak with him regarding the subpoena, when Cassidy slammed the heavy metal door on him, which caused Desai to reach up and put his right hand in front of himself and into the door frame, crushing part of his right hand, index finger, and thumb, as Cassidy tried to shut the door.  Desai Aff. ¶¶ 18-21.  Despite Desai's cries of pain and demands for Cassidy to stop, he "continued to deliberately pull the door closed against [his] hand further crushing it and causing it to bleed." Id. ¶¶ 22-23.  Desai states that Bishop, who was behind him, clearly saw what was going on and told Cassidy to open the door, but only after he saw that Desai's hand was bleeding, and eventually helped Desai pull the door out so he could remove his hand.  Id. ¶¶ 24-25.  Desai contends that this incident "went on for 30 seconds or more." Id. ¶ 27.[7]  From inside the building, Rajkumar

---

[7]     Desai tells a similar, although slightly different version of the incident in his deposition:

> Q:     What did he say when you told Officer Cassidy that he had the records?
> A:     He said, I don't want to talk to you.  Then he went inside.
>         And as I was holding the door - - I opened the door, he went inside. And then he pulled the door from inside - - I'm holding the door like this, here is my finger and everything, and he's pulling from inside  [indicating].  And I said, You son of a bitch, you're killing my hand.  You're crushing my hand.  What the hell are you doing?
>         Now Bishop is behind me.  And he says, What's happening?
>         I said, Cassidy, you better stop this nonsense, and he kept on pulling.  Now the blood is coming out of my finger and my hand.  Then he opened the door.  It was Bishop who actually also pulled the door off, which was heavy, steel door.
>          . . .
> Q:     Okay.  How long did this episode take?
> A:     Approximately, about 30 seconds.
> Q:     Did you remove your hand from the doorknob?
> A:     Oh, absolutely.  I mean, I was trying to pull, and then Bishop actually helped me to pull the door out so that by the time Cassidy had the doorknob - - and my hand is already bleeding.

(continued...)

witnessed one of the deputies re-enter the IFMC while the second officer remained outside with Desai, observed a struggle with the door, and heard Desai "yelling to stop and that he was being hurt." Rajkumar Aff. ¶ 10.

Both deputies maintain that Cassidy did not injure Desai's hand but instead simply walked through the door, without looking back, allowing the door to close automatically behind him, and Desai and Bishop came through the door shortly after Cassidy. Cassidy Aff. ¶ 11; Bishop Aff. ¶¶ 7, 9. The parties agree that Cassidy and Bishop, once back inside the office, continued to request the medical records. Desai Aff. ¶ 28, Cassidy Aff. ¶ 7. After learning that they had all of the applicable medical records, Bishop and Cassidy left.[8] Desai Aff. ¶ 30; Cassidy Aff. ¶¶ 8-9. Thereafter, a nurse at the IFMC treated Desai's hand, which was red and bleeding after the incident. Desai Aff. ¶ 29; Rajkumar Aff. ¶ 11. Both deputies deny not only causing any injury to Desai's hand, but also any awareness that Desai suffered any injury while they were present at the IFMC. See Cassidy Aff. ¶¶ 10-11; Bishop Aff. ¶ 9.

Based on the incident, on or about August 3, 2010, Desai filed a complaint with the SCSO alleging misconduct. Desai Aff. ¶ 37. No one from the SCSO contacted or interviewed Desai in response to the complaint. Id. ¶ 38. Following the complaint, Bishop prepared an Investigative Supplement to the Incident Report setting out his version of

---

[7](...continued)
Desai Dep. at 59-60, 63. While in his Deposition, Desai explains that he held the door open for Cassidy, he states in his Affidavit that Cassidy re-entered the building with Desai following closely behind. See Desai Dep. at 60-61; Desai Aff. ¶ 18. Although somewhat ambiguous, to the extent that it is more favorable to Desai that Desai threw his hand up on the door as Cassidy attempted to close or slam it, the Court will construe the facts as Desai relayed them in his Affidavit.

[8]      Desai discusses an additional conversation with Cassidy regarding where his son was taken, and a telephone conversation between his attorney and Cassidy; however, these conversations are not pertinent to Desai's claims and the resolution of the instant Motion.

events.  Bishop Aff. ¶ 10; Exhibit 1 to Bishop Aff.  Cassidy also added an Investigative Supplement to the investigation and arrest report for Raj Desai, detailing his encounter with Desai. Cassidy Aff. ¶ 16; Exhibit 1 to Cassidy Aff.  Lieutenant Bobby Caruthers investigated Desai's complaint and interviewed both Bishop and Cassidy regarding the alleged event, who denied its occurrence.  Cassidy Aff. ¶ 10; Bishop Aff. ¶ 11.  After his interviews, Caruthers determined that the complaint was unfounded.  Brannen Aff. ¶ 10.  Jack Jordan, the Chief Deputy at the time, also interviewed Cassidy and concurred with Caruthers' determination.  Id.

As a result of this incident, Desai initiated the instant lawsuit.  In his First Amended Complaint (Doc. No. 29; Complaint), Desai asserts claims against William O. Farmer (Sheriff Farmer), as the Sheriff of Sumter County, for battery (Count One) and negligent training (Count Six).[9]  He asserts claims for battery (Count Two), excessive force in violation of his civil rights under 42 U.S.C. § 1983 (Count Three), and negligence (Count Four) against Defendant Cassidy.  Additionally, Desai asserts a single claim against Defendant Bishop for violating his constitutional rights by failing to intercede when Defendant Cassidy used excessive force against him (Count Five).  Defendants jointly filed the instant Motion seeking summary judgment on all claims asserted against them.

_____

[9]        The Complaint contains a typographical error, referring to both Counts Five and Six as Count Five.  See Complaint at 9-10.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[10]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be

---

[10]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

determined at trial.  See Clark, 929 F.2d at 608.  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Summary of the Arguments

Defendants[11] seek entry of summary judgment in their favor as to all six Counts of the Complaint.  Although they recognize that there is a factual dispute with respect to whether Cassidy slammed Desai's hand in the door, Defendants argue that summary judgment is appropriate as to Counts Three and Five because Bishop and Cassidy were not acting under color of law when Cassidy allegedly injured Desai's hand and Bishop failed to intervene.  Alternatively, as to Count Five, Defendants argue that even if Bishop was acting under color of law, summary judgment is proper because Bishop could not have intervened any earlier.

---

[11]      Because Defendants filed a single Motion, the Court refers to each argument as having been made by Defendants collectively regardless of whether the arguments are relevant only to a single Defendant.

Defendants also assert that Sheriff Farmer is entitled to summary judgment as to Count One because Cassidy was not acting within the scope of his employment, and therefore, Sheriff Farmer cannot be held vicariously liable.  As to Count Two, Defendants argue that there is no evidence Cassidy intentionally shut the door on Desai's hand because Desai could not see what was happening on the other side of the door, and the door had an automatic closing mechanism.  With respect to the negligence claims, Defendants argue that they did not owe a duty to Desai.  Last, as to the negligent training claim, Defendants argue that Sheriff Farmer is not liable because there was no underlying use of force, the Sheriff is immune from liability for discretionary functions such as training on the use of force, and because the officers received adequate training on the use of force.

IV.     **Discussion**

   A.     **Section 1983 Claims against Cassidy and Bishop**

   "[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law." Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); see 42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted).  Here, Desai

asserts that Defendants violated his Fourth Amendment rights.[12]  Specifically, Desai alleges that Cassidy violated his constitutional right to be free from excessive force and Bishop failed to intercede to prevent that violation.

>    1.    **Whether Cassidy and Bishop Were Acting Under Color of Law**

Because both officers allege that Desai cannot establish that they were acting "under color of law" at the time of the incident, the Court addresses this element first.  Section 1983 addresses only deprivations of federal statutory and constitutional rights; it does not create a federal remedy for tort claims.  Almand v. DeKalb Cnty., Ga., 103 F.3d 1510, 1512-13 (11th Cir. 1997).  Therefore, to recover pursuant to § 1983, a plaintiff must show that a person acting under color of state law deprived him or her of a federal right.  Id. at 1513 (citing Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992)).  "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state."  Id. (citing Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1522 (11th Cir. 1995)).  However, not every act by a state employee is an action under color of law.  Id.

The determining factor is whether the official in question "was acting pursuant to the power he/she possessed by state authority or acting only as a private individual."  Id. (quoting Edwards, 49 F.3d at 1523).  Thus, "'acts of officers in the ambit of their personal pursuits are plainly excluded' from being under color of law, while the '[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.'"  Butler v. Sheriff of Palm Beach Cnty., 685 F.3d 1261, 1265-66

---

[12]    The Fourth Amendment applies to state and local governments pursuant to the Due Process Clause of the Fourteenth Amendment.  See Brown, 608 F.3d at 734 n.15.

(11th Cir. 2012) (quoting Screws v. United States, 325 U.S. 91, 111 (1945)) (alteration in original).  To fall within the traditional definition of acting under color of state law, a § 1983 defendant must "have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Myers v. Bowman, 713 F.3d 1319, 1329 (11th Cir. 2013) (quoting West v. Atkins, 487 U.S. 42, 49 (1988)).  A defendant also may have acted under color of law even if he was not acting by virtue of his employment, if he acted in a manner that "makes clear that he was asserting the authority granted him and not acting in the role of a private person." Id. (quoting Williams v. United States, 341 U.S. 97, 100 (1951)).  Evaluating whether a plaintiff has sufficiently established that a defendant was "acting 'under the color of state law' is a fact-intensive inquiry to be handled on a case by case basis." Doe v. Mann, No. 6:05-cv-259-Orl-31DAB, 2007 WL 604981, at *4 (M.D. Fla. Feb. 22, 2007).

Although there is no question that Bishop and Cassidy were on duty at the date and time in question, and that they were at the IFMC executing the instanter subpoena, Defendants argue that the deputies were not acting under color of law as to Desai because he did not work at the IFMC, was not under investigation or arrest, and therefore was not related to their business there. See Motion at 3-4, 8-10.  Defendants concede that they were acting under color of law when Cassidy warned Desai that he would be under arrest if he continued to interfere with their investigation, and when Cassidy retrieved the subpoena from Desai's hands, but suggest that when Cassidy turned to re-enter the building, even if he did slam the door on Desai's hand, Cassidy was not acting under color of state law because

there was no evidence that in doing so he was exerting of his authority as a law enforcement officer.  See id. at 10-14.  Defendants' argument, while creative, is without merit.

In support of their position, Defendants rely on the Eleventh Circuit's opinion in Almand.  There, a police officer met the plaintiff while she was searching for her missing daughter and offered to assist her.  Almand, 103 F.3d at 1511.  After the daughter returned home, the police officer claimed to have information about who may have assaulted the daughter while she was missing, but would only give the plaintiff the information if she slept with him—an offer which she declined.  See id. at 1512.  Ultimately, the police officer went to the plaintiff's home.  Id.  After the plaintiff allowed him to come in, the officer began making sexual advances, and the plaintiff asked him to leave.  See id.  The police officer honored her request and walked out of the plaintiff's house.  See id.  Apparently changing his mind, however, the police officer then broke the door down, re-entered the house and forcibly raped the plaintiff.  See id.  The Eleventh Circuit held that the police officer's initial visit was likely conducted under color of state law because his position with the police department gained him access into her home, but once he walked out the door, he was no longer acting under that authority, and therefore was no different than any other citizen.  See id. at 1514-15.

Defendants' reliance on Almand is misplaced.  Defendants appear to contend that, under Almand, whether a police officer is acting under color of law depends on the person with whom they are interacting and what they are doing.  Such a case may exist, for example, if a police officer goes to a bar to execute a warrant, and after having done so, decides to stay for a drink because it is the end of his shift.  However, the undersigned is

-13-

aware of no authority for the proposition that a court should parse out a police officer's actions when serving an instanter subpoena and interacting with the individuals present at the location at which the necessary records are located.  According to Defendants, because Cassidy allegedly crushed Desai's hand as any other private citizen could have, such a violation is not a constitutional one.  <u>See</u> Motion at 13-14 ("Desai testified the officer did not say anything, so no verbal connection to authority was made, and there is no evidence from any party that a scuffle was going on and Officer Cassidy did it for the purpose of subduing Desai or protecting himself.").  This argument ignores the undisputed reality that the entirety of the officers' interaction with Desai resulted from their effort to obtain the medical records in response to the subpoena which they were authorized to serve under state law.

There is no dispute that Bishop and Cassidy would not have been at the IFMC but for the execution of the instanter subpoena and, according to Desai's version of events, he would not have been attempting to reason with them—both outside and while following Cassidy into the building—but for the same motivation.  Viewing the evidence in the light most favorable to Desai, Cassidy could have acted to prevent Desai from challenging Cassidy's authority and interfering in the official police business he and Bishop were there to conduct—obtaining medical records.[13]  These are sufficient facts at this stage of the

---

[13]     To the extent Defendants are arguing that Cassidy would not have had the legal authority to slam Desai's hand in the door, such an argument is also unavailing.  As the Court in <u>Anderson</u> explained:

> This requirement cannot mean that an officer must have been acting within the scope of his authority in order for him to have been acting under color of state law.  If that were true, no § 1983 suit could ever succeed, for the premise of a successful suit is that the officer acted illegally—that is, outside the scope of his authority.  Instead, the requirement must mean only that the challenged conduct must have a sufficiently close relationship to the officer's "governmental status" or to "the performance of his duties."

(continued...)

proceeding to satisfy Desai's burden of showing that Defendants Bishop and Cassidy were acting under color of state law.  As this is the only basis on which Defendants seek summary judgment as to Count Three, Defendant Cassidy is not entitled to summary judgment as to the excessive force claim in Count Three.

### 2.     Failure to Intervene

As to Count Five, Defendants argue in the alternative that, even if they were acting under color of law, Bishop is not liable for failing to intervene because he did not have an opportunity to do so.  See Motion at 15.  Just as the Fourth Amendment prohibits the use of excessive force, it also requires that a police officer intervene to stop another police officer's use of excessive force when he has the ability to do so.  Grimes v. Yoos, 298 F. App'x 916, 921 (11th Cir. 2008).  "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."  Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007)).  However, an officer is only liable for failing to intervene if he was in a position to do so.  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000).  Indeed, in the Eleventh Circuit and elsewhere, courts have held that an officer will not be held liable for the actions of another officer if he does not have time to intervene.  See Mincey v. Ammons, No. CIVA CV505-043, 2006 WL 3747370, at *3 (S.D. Ga.  Dec. 18, 2006) (citing cases).

---

[13](...continued)

Anderson v. Warner, 451 F.3d 1063, 1069 (9th Cir. 2006).

Even if Cassidy is not entitled to summary judgment as to Count Three, Bishop argues that he is entitled to summary judgment as to Count Five because he had no opportunity to intervene during the brief incident between Cassidy and Desai. See Motion at 15.  Further, Defendants contend that even Desai himself alleges that in the brief period of the incident Bishop helped him pull the door off his hand. See id.  In his deposition, Desai described the episode as the following short sequence of events:  Cassidy pulling the door closed on his hand, Desai responding that Cassidy is crushing his hand, and Bishop asking what is happening behind him.  Desai Dep. at 59-60.  Then Desai tells Cassidy to stop and Bishop actually pulls the heavy door off of his hand as it begins to bleed. See id. at 60, 63.  In order to establish that Bishop did have an opportunity to intervene, Desai submits his Affidavit in which he states that "Bishop, who was standing behind me during this incident, clearly saw that Cassidy was hurting me and eventually, after my hand began to bleed, told Cassidy to 'Open the door, we are coming.'"  Desai Aff. ¶ 24.  He further states "Bishop[] did not intercede to prevent or lessen the injuries that I received, but eventually helped me pull the door out so I could remove my hand."  Id. ¶ 25.  Although in his deposition Desai stated that the incident took approximately thirty seconds, in his Affidavit he suggests that the incident causing injury to his hand "went on for 30 seconds or more."  Id. ¶ 27 (emphasis added).

Taking the evidence in the light most favorable to Desai, Bishop was standing directly behind Desai such that he could have seen his hand get caught in the door.  However, Desai is not in the position to know whether Bishop actually saw that he was being hurt.  In fact, in his deposition, Desai acknowledges that Bishop asked what was happening, as though

he were not able to see what Cassidy was doing to Desai's hand.  Although Desai's affidavit suggests that the incident may have taken longer than half a minute, Desai does not explain how Bishop could have done more in that time than what he did—realize what was going on, tell Cassidy to open the door, and help Desai to pull his hand out of the door when Cassidy did not heed his demand.  On these facts, a reasonable jury could not find that Bishop was in a position to prevent Cassidy from crushing Desai's hand and failed to do so.  Accordingly, Defendant Bishop is entitled to summary judgment as to Count Five.

###    B.    Battery

In Counts One and Two, respectively, Desai asserts battery claims against both Sheriff Farmer in his official capacity and Cassidy as an individual.  To prevail on a claim for battery under Florida law, a plaintiff must prove "(1) the intent to cause a harmful or offensive contact with another person; and (2) an offensive contact that directly or indirectly results." Brown v. J.C. Penney Corp., 521 F. App'x 922, 923 (11th Cir. 2013) (citing Chorak v. Naughton, 409 So. 2d 35, 39 (Fla. 2d DCA 1981)).  A claim of battery against a police officer in the course of an arrest, however, is subject to a different standard because an officer is entitled to use a reasonable amount of force to carry out an arrest, and is therefore entitled to a presumption of good faith.  See Gomez v. Lozano, 839 F. Supp. 2d 1309, 1322-23 (S.D. Fla. 2012) (citing City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)).  It is only "[i]f an officer uses excessive force [that] the 'ordinarily protected use of force . . . is transformed into a battery.'" Davis v. Williams, 451 F.3d 759, 768 (11th Cir. 2006) (quoting Sanders, 672 So. 2d at 48).  When the amount of force is arguably excessive, a jury question is created on a claim for assault and battery.  Johnson v. State Dep't of Health & Rehab.

Servs., 695 So. 2d 927, 929 (Fla. 2d DCA 1997) (citing City of Homestead v. Suarez, 591

So. 2d 1125, 1126 (Fla. 3d DCA 1992)).  On the other hand, force that is merely an "ordinary

incident" of an arrest does not give rise to an independent claim for battery.  Lester v. City

of Tavares, 603 So. 2d 18, 19-20 (Fla. 5th DCA 1992); see also Ainsworth v. Norris, 469 F.

App'x 775, 777 (11th Cir. 2012) ("[U]nder Florida law, an alleged battery that was committed

incident to arrest does not give rise to an independent tort.").

      Because Cassidy was not attempting to arrest or detain Desai, no incidental amount

of force was justified.  The Court therefore does not apply the presumption of good faith to

Cassidy's actions.  However, the fact that Cassidy is a police officer is still relevant in

determining whether he is liable because he may have immunity pursuant to Florida Statutes

section 768.28.  According to section 768.28(9)(a),

> [n]o officer, employee, or agent of the state or of any of its subdivisions shall
> be held personally liable in tort or named as a party defendant in any action for
> any injury or damage suffered as a result of any act, event, or omission of
> action in the scope of her or his employment or function, unless such officer,
> employee, or agent acted in bad faith or with malicious purpose or in a manner
> exhibiting wanton and willful disregard of human rights, safety, or property....
> The exclusive remedy for injury or damage suffered as a result of an act,
> event, or omission of an officer, employee, or agent of the state or any of its
> subdivisions or constitutional officers shall be by action against the
> governmental entity, or the head of such entity in her or his official capacity,
> or the constitutional officer of which the officer, employee, or agent is an
> employee, unless such act or omission was committed in bad faith or with
> malicious purpose or in a manner exhibiting wanton and willful disregard of
> human rights, safety, or property.

Fla. Stat. § 768.28(9) (2012).  In sum, "[t]he Florida statute governing waiver of sovereign

immunity provides that a state officer cannot be held personally liable in tort unless such

officer acted in bad faith[,]" see Ortega v. Schramm, 922 F.2d 684, 693 (11th Cir. 1991)

(citing Fla. Stat. §  768.28(9)(a)), and "[i]n the absence of bad faith or malicious purpose,

Florida law provides an exclusive remedy against the relevant governmental entity for any injury caused by an officer acting in the course of his employment." Prieto v. Malgor, 361 F.3d 1313, 1316 n.3 (11th Cir. 2004) (per curiam) (citing Fla. Stat. § 768.28(9)(a)); see also Hennagan v. Dep't of Highway Safety & Motor Vehicles, 467 So. 2d 748, 750 (Fla. 1st DCA 1985) ("[T]he use of excessive force by an officer in effecting an arrest may render the public employer liable for the intentional torts inflicted thereby.").

Conversely, where an individual officer does act in bad faith, the individual is subject to liability and the employer is not.  Thus, under section 768.28(9)(a), a jury could find Sheriff Farmer liable for the alleged battery, or find Defendant Cassidy liable, but not both.  See McGhee v. Volusia Cnty., 679 So. 2d 729, 733 (Fla. 1996) ("In any given situation either the agency can be held liable under Florida law, or the employee, but not both.").  The outcome depends upon the jury's determination of the facts.  See id. ("[T]he question must be put to the fact-finder whether [the defendant officer] acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property.").

Defendant Cassidy moves for the entry of summary judgment as to Count Two, the claim for battery against him, because he contends that Desai cannot prove that he intended to injure Desai's hand in the door.  See Motion at 16-17.  From where Desai stood on the other side of the door, Defendants argue that there was no way Desai could know what Cassidy was doing, and therefore whether Cassidy intentionally closed the door on Desai's hand and that he did so with malice.  See id. at 17.  Direct evidence of intent to commit a battery, however, is rare; intent instead "must be established based on surrounding circumstances."  Paul v. Holbrook, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997) (internal

citation omitted).   Further, the necessary intent is the intent to cause the contact, not the intent to cause the harm.  See id.; Quilling v. Price, 894 So. 2d 1061, 1063 (Fla. 5th DCA 2005) ("Battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent.").

If the jury accepts Desai's version of the facts, then there is evidence on which a jury could find that Cassidy intended to close the door on Desai's hand.  Desai testified that he was closely following Cassidy and screamed at him to stop pulling the door, but Cassidy continued to do so causing injury to Desai's hand until it was bleeding.  According to Desai's description, the conduct was not accidental or negligent.  Indeed, Desai contends that the force or pull behind the door was almost like someone was pulling on it with two hands. Desai Dep. at 61-63.  Viewing the evidence in the light most favorable to Desai, as the Court must, Cassidy knew that Desai was close behind him, and the pull of the door was strong, too strong to be the automatic closing mechanism of the door.   Desai contends that immediately after Cassidy walked through the door, he turned around and grabbed its handle, slamming the door on him for no reason and continued to do so despite his cries of pain.  Whether Cassidy was doing so to close the door or to hurt Desai, the Court cannot determine as a matter of law.

Based upon Desai's testimony, there is evidence sufficient to create a question of fact as to whether Cassidy intended to close the door knowing that Desai's hand could be crushed in the door.  This is all the intent required to establish that Cassidy committed a battery.  See Paul, 696 So. 2d at 1312.  Moreover, if a jury accepts Desai's testimony, it could find that Cassidy was acting in bad faith, with malicious purpose, or in wanton or wilful

disregard of Desai's human rights or safety.  See Thompson v. Douds, 852 So. 2d 299, 309 (Fla. 2d DCA 2003); see also Wynn v. City of Lakeland, 727 F. Supp. 2d 1309, 1315 (M.D. Fla. 2010) (denying officer's summary judgment motion where, if the jury accepted plaintiff's version of the facts, officer's conduct in striking the plaintiff on the head with a flashlight could be wanton and malicious).  A jury could also find that while such conduct was intentional Cassidy was not acting in bad faith, maliciously, or in such wanton or wilful disregard.  In the latter case, Sheriff Farmer might be liable.  See McGhee, 679 So. 2d at 733; Reyes v. City of Miami Beach, No. 07-22680-CIV, 2007 WL 4199606, at *3 (S.D. Fla. Nov. 26, 2007).  The Court cannot make this determination at summary judgment.  See Tepper v. Canizaro, No. 6:04-cv-1257-Orl-31DAB, 2005 WL 2484644, at *8 (M.D. Fla. Oct. 7, 2005).  Thus, the jury will have to decide whether Cassidy acted intentionally in closing the door on Desai's hand as alleged, and if so whether he did so maliciously or in bad faith, and summary judgment is due to be denied as to Count Two.

With regard to Count One, Defendants argue that Sheriff Farmer is entitled to summary judgment because Cassidy was not acting in the scope of his employment when he allegedly intentionally closed the door on Desai's hand.  See Motion at 15-16. Elaborating on this argument, they contend that Cassidy's actions would serve no purpose of the SCSO.  See id. at 16.  Florida has a three part test for determining the scope of a person's employment:

> An employee's conduct is within the scope of his employment only if [(1)] it is the kind he is employed to perform, [(2)] it occurs substantially within the time and space limits of the employment and [(3)] it was activated at least in part by a purpose to serve the master.

Lawrence v. Dunbar, 919 F.2d 1525, 1528 (11th Cir. 1990) (quoting Rabideau v. State, 391

So. 2d 283, 284 (Fla. 1st DCA 1980)).  Whether a defendant was acting within the scope of

his employment is a question of fact unless the evidence is such that there is only one

conclusion the factfinder could reach.  Blount v. Sterling Healthcare Grp., Inc., 934 F. Supp.

1365, 1372 (S.D. Fla. 1996).  Defendant cites Blount for the proposition that an employer is

not liable for the employee's torts if the employee has "stepped aside" from his employment

or commits a tort to further a purpose of his own.  Motion at 16.  The court in Blount also

explained, "however, if the tort is activated at least partly to serve the master, then

respondeat superior liability may exist."  Blount, 934 F. Supp. at 1372.  Indeed,

> under the principles of the common law an employer is liable in damages for
> the wrongful act of his employee that causes injury to another person, if the
> wrongful act is done while the employee is acting within the apparent scope
> of his authority as such employee to serve the interests of the employer, even
> though the wrongful act also constitutes a crime . . . or was not authorized by,
> or was forbidden by, the employer, or was not necessary or appropriate to
> serve the interests of the employer, unless the wrongful act of the employee
> was done to accomplish his own purposes, and not to serve the employer.

Casey v. City of Miami Beach, 789 F. Supp. 2d 1318, 1320 (S.D. Fla. 2011) (quoting Stinson

v. Prevatt, 94 So. 656, 657 (1922)).

In this case, as discussed above, Bishop and Cassidy went to the IFMC to obtain

medical records for a police investigation.  These are the kinds of tasks they are hired to

perform as police officers.  While Defendants are correct that Cassidy could not have been

hired to commit a battery on a citizen not subject to arrest or under investigation, Cassidy

had not stepped away from carrying out his duties as a police officer as he walked back

inside to continue to request the subpoenaed medical records.  Indeed, Cassidy's actions

in allegedly slamming the door on Desai could be interpreted as attempting to stop Desai

from interfering with Cassidy's attempts to collect medical records he believed were being unlawfully withheld.  The objective of obtaining the medical records on behalf of the SCSO activated his conduct.  Further, the alleged incident occurred while Cassidy was on duty, and thus, within the time and space limits of his employment.  Simply because such conduct may have been improper does not render it outside of the scope of his employment.  See Casey, 789 F. Supp. 2d at 1320.  Accordingly, the Motion is due to be denied to the extent it seeks summary judgment as to Count One.

### C.    Negligence against Cassidy

In  Count  Four  of  the  Complaint,  Desai  alleges  that  "Deputy  Cassidy  either purposefully or negligently slammed the heavy steel entrance door to IFMC while being closely followed by Plaintiff on July 2, 2010."  Complaint ¶ 57.  Defendants argue that Desai cannot  maintain  that  Cassidy's  conduct  was  negligent  rather  than  intentional  but  also malicious  such  that  he  would  not  be  immune  from  liability  pursuant  to  Florida  Statutes section 768.28.  See Motion at 18-19.  Although Desai attempts to plead negligence in the alternative to his battery claim, "it is not possible to have a cause of action for 'negligent' use of  excessive  force  because  there  is  no  such  thing  as  the  'negligent'  commission  of  an 'intentional' tort."  Sanders, 672 So. 2d at 48; see also Brown, 521 F. App'x at 924 ("A claim for  negligence  cannot  be  premised  solely  on  a  defendant's  alleged  commission  of  an intentional tort.").   Moreover, even if it were possible to discount Desai's allegations that Cassidy's actions were entirely intentional, he cannot simultaneously maintain that Cassidy was negligent and acting with "wanton and willful disregard" in the context of section 768.28. Indeed, if Cassidy was acting intentionally, then he was not acting negligently.  If Cassidy

was acting negligently and did not realize that Desai's hand was in the door, then he cannot be liable under section 768.28(9).  See Bolander v. Taser Int'l, Inc., No. 07-cv-80789, 2009 WL 2004379, at *16 (S.D. Fla. July 9, 2009) (explaining that, pursuant to section 768.28(9), "the officers cannot be liable for negligence").  Based on the foregoing, Defendant Cassidy is entitled to summary judgment as to Count Four.

### D.     Negligent Training against the Sheriff

In Count Six of the Complaint, Desai asserts a claim under state law for negligent training against Sheriff Farmer in his official capacity.  Specifically, Desai alleges that Sheriff Farmer breached his duty of care by failing to adequately implement his training policies in the use of force because he did not properly train Cassidy and Bishop.  See Complaint ¶¶ 67-69.  Although the State of Florida and its subsidiaries such as municipalities are generally immune from tort liability, "Florida has waived this immunity 'under circumstances in which the state agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state."  Christie v. Lee Cnty. Sheriff's Office, No. 2:10-cv-420-FtM-36DNF, 2011 WL 4389621, at *6 (M.D. Fla. Sept. 21, 2011) (citing Fla. Const. art. X § 13 and quoting Fla. Stat. § 768.28(1)).  Thus, when presented with a negligence suit against a state or its subsidiary, the Court "should first determine whether the circumstances alleged would subject a private person to liability under Florida law." Lewis v. City of St. Petersburg, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing Kaisner v. Kolb, 543 So. 2d 732, 734 (Fla. 1989)).  As in other cases of negligence, a plaintiff asserting a claim for negligent training must establish the elements of duty, breach, causation, and damages.  Wynn, 727 F. Supp. 2d at 1316.

-24-

If the plaintiff can meet this burden, then the Court must decide "whether the challenged actions are nonetheless acts which required the exercise of basic governmental discretion, as opposed to implementation of an already established policy." Lewis, 260 F.3d at 1262.  "[G]overnmental liability does not exist when the challenged act of the government or its agent is 'discretionary' in nature." Gelbard v. City of Miami, Fla., 845 F. Supp. 2d 1338, 1340 (S.D. Fla. 2012) (quoting Lewis, 260 F.3d at 1264).  A discretionary act meets all of the following conditions:

> (1) the action involves a basic governmental policy, program, or objective; (2) the action is essential to the realization or accomplishment of that policy, program, or objective; (3) the action require[s] the exercise of basic policy evaluation[s], judgment[s], and expertise on the part of the governmental agency involved; and (4) the governmental agency involved possess[es] the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision.

Id. (quoting Lewis, 260 F.3d at 1264) (alterations in original).

The Court first examines the threshold issue of whether Sheriff Farmer could be liable for negligence if he were a private party.  Defendants argue that Sheriff Farmer did not owe an individual duty to Desai but rather owed a general duty to the public at large.  See Motion at 21.  Whether a duty of care exists is a "minimal threshold legal requirement for opening the courthouse doors" and it "poses a question of law that the court must answer before permitting a negligence claim to proceed before the trier of fact." Wallace v. Dean, 3 So. 3d 1035, 1046 (Fla. 2009) (internal citations omitted).  Generally, a law enforcement officer's duty to protect citizens is a general duty owed to the public as a whole. Everton v. Willard, 468 So. 2d 936, 938 (Fla. 1985).  A special duty may arise in circumstances in which an individual is in danger due to providing assistance in the arrest or prosecution of criminal

defendants, or in cases in which an individual is otherwise placed in police custody. See id.; Kaisner, 543 So. 2d at 734-36. Moreover, even in non-custodial situations, when any "defendant, including a police officer, by his or her conduct creates a foreseeable zone of risk, the law imposes a duty owed by the defendant to all individuals within the zone to act with reasonable care." Lewis, 260 F.3d at 1263.

Citing Lewis, Defendants argue that Desai was not in custody or a foreseeable zone of risk such that Sheriff Farmer did not owe him a duty. See Motion at 21. Desai does not respond to this argument. However, assuming arguendo that such a duty existed, summary judgment is due to be granted as to this claim because Desai has not presented any evidence to create an issue for trial as to whether Sheriff Farmer breached such a duty.

The difficulty in proving Desai's claim is that he alleges that Sheriff Farmer breached his duty by failing to train Cassidy and Bishop in the use of force. While both deputies deny applying any force, Defendants submit undisputed affidavit evidence that the officers receive annual training regarding the use of force. See Brannen Aff. ¶ 4. Bishop and Cassidy received this annual training in 2009 prior to the incident and in 2010 following the incident. See id. Additionally, the evidence reflects that neither officer has been subject to any previous disciplinary action. Id. ¶ 5. Moreover, the SCSO use of force policies apply in circumstances in which officers are attempting to arrest or detain a suspect, neither of which occurred in this case. See id. ¶¶ 7-8. Assuming Desai's allegations could be construed to allege breach of a duty to train Cassidy and Bishop to interact appropriately with civilian bystanders—and not, for example, slam doors on those citizens' hands—Desai points to no

evidence of a breach of that duty to train.[14]   While the SCSO does not have a policy of

dealing with belligerent citizens, it dictates that SCSO officers should treat the public

courteously.  See Brannen Aff. ¶ 9.  This evidence is sufficient to shift the burden to Desai

to present some evidence that the SCSO polices and training were inadequate to raise a

question of fact for trial as to whether Sheriff Farmer breached his duty to train Cassidy and

Bishop.   Desai has not presented evidence suggesting what additional training was

necessary or how Sheriff Farmer failed to implement any appropriate training.  As such,

Sheriff Farmer is entitled to judgment as a matter of law as to the negligent training claim.[15]

---

[14]      In his Response, Desai contends that evidence of Sheriff Farmer's negligent training is that Cassidy used force when he had no reason to do so, and that neither Cassidy nor Bishop reported Desai's injuries to anyone.  See Response at 12-13.  Neither fact suggests that Sheriff Farmer failed to train Bishop and Cassidy as to when and where not to use force.
      Similarly, Desai's contention that "[t]he mere fact that this outlandish incident took place is at least some evidence that Cassidy and Bishop were not properly trained in the use of force" is without merit.  Id. at 13.  One isolated incident involving a single deputy's use of force does not create a question of fact as to the sufficiency of Sheriff Farmer's training.  Desai does not dispute the adequacy of the use of force policies or claim that Cassidy and Bishop did not receive training on the use of force.  He cannot simply argue that Cassidy's conduct must be related somehow to any action or inaction on the part of Sheriff Farmer without submitting any evidence that would support his claim.  See Jeffery, 64 F.3d at 593-94.

[15]      Because the Court has found that Sheriff Farmer is not liable for negligence as a matter of law, it need not reach Sheriff Farmer's sovereign immunity argument.  However, the Court notes that even if Desai had established that Sheriff Farmer was negligent in failing to train Cassidy and Bishop for the type of incident that is alleged to have occurred, Sheriff Farmer would be immune from liability because his decision as to how to train his employees is a discretionary function.  In Lewis, the Eleventh Circuit explained that "[a] city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning."  See Lewis, 260 F.3d at 1266.  On the other hand, a challenge to the implementation or operation of a city's policies or training program would involve operational actions for which the city would not have sovereign immunity.  See id.  Desai attempts to assert the latter claim against Sheriff Farmer by alleging that he failed to "implement" the established policies and procedures regarding the use of force because Sheriff Farmer did not sufficiently train Cassidy and Bishop according to that policy.  See Complaint ¶ 68.  However, there is no dispute that the situation alleged in this case did not warrant the use of force, and therefore the use of force policies in place did not apply.  See Bishop Aff. ¶ 15; Cassidy Aff. ¶ 15; Response at 12.  Because the existing use of force policy did not apply, Desai's claim relating to Sheriff Farmer's failure to train is actually a claim that Sheriff Farmer should have had other policies and trained his officers as to those policies.  As such, Desai's negligent training claim relates to Sheriff Farmer's failure to create a policy, and that action is discretionary in nature.  Accordingly, Sheriff Farmer would also be entitled to summary judgment on the basis of
(continued...)

## V.    Conclusion

In light of the foregoing, Defendant Cassidy is entitled to the entry of summary judgment as to Count Four, Defendant Bishop is entitled to the entry of summary judgment as to Count Five, and Defendant Farmer is entitled to the entry of summary judgment as to Count Six.  Summary judgment as to the remaining counts is due to be denied.  Accordingly, it is hereby

**ORDERED**:

1.    Defendants' Motion for Summary Judgment and Memorandum of Law (Doc. No. 35) is **GRANTED, in part, and DENIED, in part**.  The Motion is granted as to Count Four (negligence), Count Five (§ 1983 failure to intercede), and Count Six (negligent training). The Motion is denied as to Count One (battery), Count Two (battery) and Count Three (§ 1983 excessive force).

2.    Pursuant to Rule 54(b), Federal Rules of Civil Procedure, there being no just reason for delay, the Clerk of the Court is directed to terminate this Defendant from the court docket and enter **JUDGMENT** in favor of Defendant Michael Bishop, and against Plaintiff Pankaj T. Desai, as to the single claim brought against Bishop in Count Five of this action.

**DONE AND ORDERED** in Jacksonville, Florida, this 29th day of October, 2014.

MARCIA MORALES HOWARD
United States District Judge

---

[15](...continued)
sovereign immunity.

-28-

lc16

Copies to:

Counsel of Record